Hello, appellate court. Fourth division is now in session. The Honorable Justice of the Federal Courthouse presiding. Good morning. Please be seated. Will the attorneys who are going to make a presentation today please approach the podium and identify yourself and the party you represent. Good morning, Your Honors. I'm Michael Gentithis on behalf of the appellant, Leonard DeLeon. Good morning, Your Honors. Assistant State's Attorney Mary Laird on behalf of the people. Good morning. We have allotted 30 minutes for this case and that time is going to be divided equally between the parties. The appellant may reserve a few minutes for his rebuttal if he chooses. That's a goal where we can be flexible because this is the only case on the docket this morning. And with that, you may begin. Thank you. Thank you. Good morning, Your Honors. Michael Gentithis on behalf of the appellant, Leonard DeLeon. If I could, I'd like to reserve two minutes in rebuttal. Though DeLeon raises two issues in his brief, I'm going to focus my argument on the sufficiency of the evidence issue pending any questions Your Honors may have on either topic. The simple facts of this case lead to a simple conclusion. Leonard DeLeon did not commit an unlawful sale of a firearm. Now, because the parties agree that a gun was delivered on April 19, 2008, all this court needs to determine is when there was an application to buy that gun. That's clear. When DeLeon and his friend, Joe, entered Blythe's Sports Shop on April 15, picked out a gun, paid for it, and completed the application paperwork to buy it, there was an application, an agreement to purchase that gun that did not violate the statute. What the State essentially wants to do here is fit a square peg into a round hole. They're trying to apply an unlawful sale of a firearm statute, Section 243G, that simply doesn't fit the facts below. Under Section 243G, the parties must wait 72 hours between the application to buy a gun and the delivery of that gun. Application has a clear and unambiguous definition. In the statute, it's defined as the agreement between the parties to purchase a firearm. Under the clear language of the statute, DeLeon simply did not commit an unlawful sale of a firearm. Again, the parties agree that delivery here occurs on April 19. That's when DeLeon and Joe returned to Blythe's to pick up the gun that Joe had picked out three days earlier. The only issue then is when there was an application, that agreement to purchase between the parties for the gun. That's simple. The application happened when Joe and DeLeon applied. When, on the 15th, they traveled to Blythe's sports shop, picked out a gun, and filled out the application paperwork. The State is arguing there is really no complete agreement in this case because after the gun was delivered, the other individual gave the defendant $200. There's no evidence in the record that $200 in any discussion had ever been agreed on before and that this transaction was not completed until the $200 was paid and he got a gun less than three days after that. The issue that this Court has to resolve is when there was an agreement, when there was an application, not when the transaction was necessarily completed. If we assume the $200 is the purchase price and there's no discussion of the purchase price until the $200 was tendered, is that when the agreement was formed? The agreement was formed between the parties on April 15th when there was an application to buy a firearm from Blythe's. The State wants to have it, have DeLeon prove when the agreement arose, but it's actually the State's burden to demonstrate that there was that application and agreement within 72 hours of a delivery. Any ambiguity in the record in that case shouldn't be resolved in favor of the State. It's the State's burden to demonstrate a violation of the statute. That would require an agreement sometime after April 15th. Furthermore, the facts here tend to show that the agreement did arise on April 15th. The hats that the parties are wearing at that point really is somewhat immaterial. Under any rational view of the facts, the relevant parties agreed at that point to buy a firearm. Who's considered the buyer, who's considered the seller isn't important so long as that agreement's in place more than 72 hours in advance of the delivery that all parties agree occurs on April 19th. But what do you have to have for an agreement? Simply a meeting of the minds between the parties. On what? I'm sorry? On what points? On what terms? What terms have to be worked out for there to be an agreement? The topic of the agreement was the purchase of a firearm. That was certainly understood. The details of the service that Mr. DeLeon was going to be providing, acting as a purchaser of this weapon, was understood. But was the price understood? The price may have been understood. There's nothing clear on the record that there was or was not a discussion of price as of April 15th. We do have a course of dealing between these parties. In a prior occasion, DeLeon was paid the exact same amount by this same person when he did the same transaction at Blythe Sports Shop. Don't we have to review the evidence in the light most favorable to the state? But the state's burden here is to prove beyond a reasonable doubt that there was an agreement sometime after April 15th. If the evidence in the record has some doubt as to when that agreement arose, that shouldn't necessarily be resolved in favor of the state. The burden borne by the state was not met on the evidence below. When the parties enter Blythe Sports Shop, fill out an application, pick out the gun, pay for it, there's an agreement in place. You can look at this in a number of ways as to who exactly is acting as buyer and seller. But under any one of those interpretations, it's clear that as of April 15th, when DeLeon and Joe go together to the gun shop to pick one out, there's an agreement between the parties that are relevant here. Now, that's not to say that there isn't a statute that might apply to DeLeon's actions. Section 24-3.5, the unlawful purchase of a firearm statute might apply. That prohibits buying a gun with the intent to later transfer it to someone who the buyer knows is not legally allowed to own one. But that's not what the state charged here. What they used was a statute that's really more appropriately applied to a gun seller like Blythe's. Section 24-3G is designed to ensure that a shop like Blythe's has a chance to conduct that background check on the buyer and that the buyer has a chance to cool down from anything that might have provoked him or her to buy a gun. Counsel, you don't argue that the statute has no application in this case, do you? I'm sorry? You don't argue that the statute has no application in this case, do you? The statute doesn't fit the facts here. DeLeon did not commit a violation of Section 24-3G. And that's simply because there was an application, an agreement to purchase, more than 72 hours in advance of the delivery that occurred on April 19th. Section 24-3.5 would be more fitting for the facts, but the state didn't charge it. Because of the state's choice in charging, it had to prove beyond a reasonable doubt that that application and agreement arose sometime before April 15th. It simply cannot prove that. The unlawful sale of a firearm statute doesn't apply to a straw purchase, such as what DeLeon acted as here. Counsel, so in 2005, I think it was the General Assembly amended the statute. That's correct. And gave a definition to application. Maybe they did that in response to the Hurtado decision, maybe not. We don't know. About 14 years earlier, it's tough to say. Yes, it's pretty long for them to wait if that's what they wanted to do. But we don't know. Legislative history tells us nothing about it. But we have to determine that. I'm not aware of any case that has interpreted agreement to purchase, which is the definition of application. If you are, I'd like to know it. But I'm not aware of any. And so that's what we're trying to grapple with is how do we define it. The state says, how can you have an agreement to purchase without agreeing on the price? And that's what I'd like you to address. If I say to you, let's forget there's a gun shop involved. Let's just say I own a gun. And I privately, maybe I'm in a gang, and so are you, and I want to sell you a gun. And you say, hey, I like that gun of yours. I want to buy it. And I say to you, I want to sell it to you. Do we have an agreement to purchase before I've told you how much I'm going to make you pay for it? Now, in the hypothetical you're proposing, no. But I don't think that's an analogy to the case here. But why don't we have an agreement to purchase at that moment? It's because we haven't agreed on the price, right? It's because you haven't agreed to all the material terms of the contract. Including price. Including price. However, in this case you have evidence both that there was a prior course of dealing between these parties where a price was agreed upon, the same price was paid a few months before this transaction, so the parties had an understanding. You also have their behavior in this case, which indicates that an agreement was in place as of April 15th. There's simply no reason for Joe to travel to Indiana with DeLeon, pick out the gun that he wants, and give DeLeon the money to buy that gun, unless they've already agreed that that gun is going to be Joe's after the waiting period ends. That agreement was already in place once they traveled to Indiana on the 15th. If there are no further questions from the Court, because the parties observed the relevant 72-hour waiting period, Leonard DeLeon's conviction must be reversed. Thank you. Good morning, Your Honors. Again, Assistant State's Attorney Mary Laird on behalf of the people, and may it please the Court. Your Honors, by his own statement, defendant provided the exact address at which the agreement, transfer, payment, and delivery of a .40 caliber handgun took place in Calumet Park, Illinois. This Court reviews the evidence in the light most favorable to the people, and emphasizing that standard, defendant did not wait the required 72 hours before transferring the handgun, where all essential terms of the agreement to purchase were not agreed upon until April 19th. And, Your Honors, defendant was, in essence, a straw purchaser of a handgun for an individual, Joe, who, based on the circumstantial evidence of the transaction itself, was clearly unable to purchase the .40 caliber handgun in his own right. And this is exactly the type of conduct that the legislature sought to criminalize by making the unlawful sale of a firearm statute specifically applicable to private parties. Had Joe been able to purchase the handgun for himself, there simply would have been no reason for the transaction to be conducted in the manner that it was, And certainly not. But why wasn't this defendant charged with selling to a person who was unable to, ineligible to purchase a weapon, rather than the statute we have here in front of us? And, Your Honor, he was charged with a manner of which the charge that you are speaking of, he was charged with unlawful sale of a firearm to an individual who did not possess a FOID card, and he was acquitted in the trial court below. But there is a distinction between proof beyond a reasonable doubt that Joe, the individual, did not possess a FOID card and reasonable inferences that are presented to this court from the circumstantial evidence of how the transaction was conducted. We know that Joe wasn't able to purchase a firearm on his own, not necessarily because he, the defendant was not convicted of count two, but because in the first instance, Joe provided an extra $200 for a transaction that simply would defy common sense if he had been able to purchase the gun on his own. He would not have needed to pay someone else to do it for him. Well, then you're conceding that the purchase price was actually paid by the other individual, and that this defendant basically got a commission or a fee for service. Your Honor, so there's a distinction between the two amounts that are paid. There's the unknown amount that's paid on April 15th, and there's $200 that's paid from Joe to the defendant on April 19th. And this is where the ---- Well, my point I'm getting at is apparently the full purchase price was paid on the first visit, because there's nothing in the record that any other money was paid directly to the gun shop, and the money which was paid for the gun shop came from the other individual. So in essence, this defendant did not pay a penny actually for the purchase for the gun. And yes, Your Honor, and I'll refer to that maybe as the retail value of the firearm. We don't know what it is, but we know that it was paid on April 15th directly to Blythe's gun shop. But the plain language of the statute makes it clear, unlike opposing counsel's contention, that the parties to the agreement do not matter, that the agreement needs to be between the buyer and the seller. And the agreement, any agreement that occurred on April 15th was between defendant and the store. And whether or not ---- But why would this third party pay the full price of the purchase price of the gun if there was no agreement? Your Honor, and certainly the question then on the back end is whether on April 19th had Joe refused to pay the defendant whether or not he would have transferred him the firearm. There's no evidence in the record until April 19th that the $200 ---- He may have withheld delivery because he didn't get his commission that he was promised or commission that he expected based on their prior dealings rather than failure to agree on a purchase price. The purchase price of the gun was apparently paid to the gun store. And so that was the retail value that was paid by the defendant to the store. However, the agreement, again, needs to be between the buyer and the seller to the specific transaction for the firearm. Not only is Joe unable to participate as a member of that transaction by virtue of the fact that he cannot purchase this gun for himself, who the buyer and the seller is matters. It matters who fills out the application and it matters who agrees. And in this case, Joe and the defendant, as it was charged under the unlawful sale of a firearm statute after 2005, are the buyer and the seller who reached an agreement to purchase the firearm and did not withhold delivery of that firearm until 72 hours later. Well, your argument might make sense to me. For example, if there was evidence in the record that the retail value of the gun was $100 and he later gave it to the defendant for $200. But hypothetically, if the value of the gun, say hypothetically, is a .40 caliber or whatever it is, and it was $400, and then the next day the defendant got $200 for that gun, wouldn't it be more likely than not that he's basically getting a commission? Your Honor, it's a reasonable inference if the statute did not provide for a specific agreement for a transaction for this firearm. The agreement is for the sale. It's not for the service. And so the agreement is for the sale of this firearm that defendant purchased as a straw purchaser after crossing state lines into Indiana. The straw purchaser basically says, I'm not the real purchaser. This guy is the real purchaser. Your Honor, and certainly we would not be in this situation if on his application to buy the handgun he did not state that he was the actual purchaser of the firearm, that he did not intend to transfer it to another party, and that he was purchasing it in his own right. But he did not. He reached an agreement on April 15th with the store, and then on April 19th reached an agreement under the plain terms of Section 3AG that he was going to transfer this firearm to De Leon in exchange for $200, and that these constitute the essential. Counsel, is there anything in the record that identifies or reflects the nature of the $200 or the purpose of the $200? Because the gun at that point is already purchased. It's in the car. They're traveling back to Calumet City. Is there anything in the record that or anything that suggests to the court the nature or the purpose of the $200? Because clearly it's not the cost of the gun. And yes, Your Honor, there is direct evidence in the record in People's Exhibit No. 3, whether it's page 4 or 5, I believe it splits between the two, that he accepted the $200 in exchange for this firearm. And he states by his own language. Well, I understand that he accepted the $200. The gun at that point is somewhere in the vehicle. But is there anything in the record, even in the defendant's statement, that identifies for the state or for the parties the purpose of that additional $200? And so, Your Honor, defendant's exact words were that Joe gave me approximately $200 for buying the gun for him, and he kept the gun. And once I gave the guns to Joe, I never saw the guns again. And that occurred on April 19th, and that transaction of $200 by his own language and his own statement was for the purchase of that firearm, which is exactly what's criminalized by Section 3AG. And where we have an ambiguous term such as an agreement to purchase that is not defined within the statute itself, Your Honor is correct. This court would be the first to give meaning to the term agreement to purchase. And that's most commonly done through proper canons of statutory construction. This court has looked to several things, including the plain language of the statute, as we discussed, the purpose behind the statute, the legislative history in the 2005 amendment, and the Second District's opinion in People v. Hurtado, as well as whether there's a well-settled legal meaning, whether by judicial construction, similar bodies of law, or by similar statutes. And here, an agreement to purchase is most properly understood by its plain terms that the statute requires a buyer and a seller who engage in a transaction and then deliver a movable good conditioned upon that transaction and it criminalizes the delivery of that good within 72 hours. And so where we're looking for meaning of the term agreement to purchase, contract law and oral contract provide some guidance as to what essential terms need to be agreed to. And here, again, in the light most favorable to the people, the first time a price is mentioned on the record, a price that is indicative of agreement of that And therefore, by the plain language of the statute, by the plain language of defendant's statement, this is precisely the type of conduct that the legislature sought to criminalize as the only jurisdiction in the United States that makes the unlawful sale of a firearm waiting period applicable to a private party. And in so doing, they sought to give it a more specific meaning than the Second District afforded it in People v. Hurtado. In People v. Hurtado, defendant's conduct in this case would have constituted an agreement on April 15th because they defined an application as a mere request. And certainly on April 15th, defendant had requested to purchase a firearm. But the legislature did not amend the statute in a vacuum. This court presumes that where a legislature amends a statute, it intended to change the law as it existed before its amendment. And here, Hurtado was the only promulgation by a court as to what application for purchase meant. And the legislature no longer saw fit to stand on the terms of an application for purchase. They said it was ambiguous, certainly in Hurtado, whether it even applied to private parties. And the legislature solidified its applicability in a case such as this by making it clear that an application is when a buyer and a seller reach that agreement to purchase a firearm. And that's well grounded in the language of contract law and in this court's decisions interpreting contract law. And that's not to say that the UCC as a body of law is going to be supplanted upon a criminal law and that we're bound by all the interpretations of the UCC. It simply informs the analysis. And under the principles of statutory construction, it guides a court as to the meaning of ambiguous terms where we don't know what an agreement to purchase means. But in contract law, we've already decided. My question is this. This person who ultimately received the weapon, he paid apparently the full price of the weapon out of his pocket. The retail value, yes. And based on that, wouldn't you say that he reached an agreement to purchase the gun? Actually, his money was used to actually purchase the gun. It was just a three-day waiting period. And so, Your Honor, I'll use what my opposing counsel referred to as the different hats that people wear in the transaction. And under the statute, it matters who wears which hat. And it matters who paid the price to who. And it matters who received the consideration. The statute criminalizes the payment of money from the buyer to the seller. Here, Joe did not engage in any sort of a retail transaction with Blythe's gun shop. He did not fill out the application. Opposing counsel referred to it as when Joe and de Leon applied to purchase a gun. Joe didn't apply to purchase a gun. Joe waited. He picked up the weapon. Yes. Yes, he did. And he paid for it with his money. Yes, Your Honor. So that seems to me some type of real close agreement there. Yes, Your Honor. But, again, it's not indicative of agreement between Joe and the defendant because, quite frankly, on April 15th, defendant walks away with no money. Defendant doesn't walk away with any consideration. The store has been paid $400. And the parties to the agreement are, again, Joe and the defendant. Joe and de Leon did not apply to purchase this gun. The defendant applied to purchase this gun. Joe was ineligible for that application. And, again, under the plain language of the statute, which specifically applies to straw purchasers of illegal handguns that end up here in the city of Chicago like this handgun did, it was recovered by the Illinois State Police and Chicago Police Department in the hands of a known gang member in connection with criminal activity here in Chicago. And that's precisely the case. Counsel, as I understand your argument, you would consider the transaction at Blythe's to be somewhat of a detail. What you're prosecuting has really, in some sense of the word, nothing to do with Blythe's, I think. Right? You're saying that the agreement to purchase, the application to purchase, we can interchangeably use those phrases, occurred between Mr. Hill and the defendant. And the question is just when did that happen. And whether there happens to have been a gun shop from which the gun was originally purchased is really, in your theory of the case, that's not really pertinent. Right? And so, Your Honor, it's again a distinction as to the parties that the state seeks to prosecute. And so certainly had Blythe's or the state known at the time at which the defendant filled out the application that he planned to sell it to a known gang member, that he planned to sell it to somebody who could not purchase it on his own, certainly we would seek to criminalize the conduct by Blythe's if they knew that they were selling it to an individual who could not possess it. No, I'm just saying that we've got a law here that has a phrase, agreement to purchase, that starts a 72-hour clock. Yes. And your theory of the case, because the defendant seems to have alternative theories, but your theory seems to be the clock has nothing to do with Blythe's. Yes. The clock has to do with when Hill and DeLeon made their deal. Yes, Your Honor. And you say that that didn't happen until the 19th, because that's when all the material terms of the agreement were reached. Yes, Your Honor. And if I might just boil it down to one sentence, it's because the statute provides who the parties are, and it's the buyer and the seller. Blythe's is neither the buyer or the seller for this agreement to purchase, and so any transaction that occurred with Blythe's, it's not superfluous because certainly had they known that defendant was purchasing the gun for somebody else, it would have been criminal activity in and of itself. Well, would you concede that on April 15th, the first trip to the gun shop, that, I don't know what word to use, because I don't want to get caught up in legalisms, but there was some understanding between DeLeon and the defendant and Hill that defendant was going to get a gun for Hill? And so I'd analogize that more to the Second District's opinion in People v. Hurtado. Could you just answer my question first? Right. Would you concede that Hill wasn't just driving through Indiana because he wanted to see the sights? Yes. There was some kind of a plan, whether it was a legal agreement under the statute or not, there was some plan the first time that he was going to get him a gun. Yes, Your Honor. But that's an inescapable conclusion, right? Yes, Your Honor. And I, again, would argue that the definition in Hurtado of an initial request for purchase is more analogous to what the facts indicate happened on April 15th, and that were People v. Hurtado still good law after the 2005 amendment, and did we not have the clarification of a buyer and a seller reaching an agreement to purchase, that certainly they would have met the definition of an initial request, that Joe had requested the defendant purchase a firearm for him and together they drove to Indiana. Would you agree that the evidence is in the record here that whether they specifically agreed on the price of $200, that there was some agreement that Hill and the defendant would engage in this transaction for money? And so, Your Honor, I would say that the evidence, especially in the light most favorable to people, is that there would be some consideration paid, but there would be no specific price, and that those terms were left open for discussion and were settled on April 19th. You would agree that there was a deal that the defendant was going to get a gun for Hill in exchange for compensation for cash? Yes, Your Honor, I would agree. However, I would state that the amount is an essential term of the contract, and certainly where there is a loose agreement that two parties say, I'm going to do this for you, and then as he said in his statement, he said he was going to hit me back after the transaction. But an oral contract cannot be established without a specific price. Certainly on that date, had Joe refused to pay him, it's a likely inference that he would have refused to give him the gun. Well, is it the contract for the gun that's unsettled, or is it the contract for services that it's became, that was still unsettled? Your Honor, and so where the delivery of the gun is kind of the gravamen of the offense, it's the conduct that's sought to be prohibited. And so the agreement and the price and all the transaction that surrounded it is not for the services, but it's for the delivery of that firearm. It's for the sale, and it's for the sale between that buyer and the seller who had not reached that agreement prior to April 19th. So Hurtado read this statute as an initial request, which has a one-sided feel to it. One party asked for it. Yes. And the General Assembly came in and said, no, a one-sided request is not enough. We want an agreement. Yes. Which at a minimum means there has to be more than one party to this. The other side has to say, I accept your request, I'm going to help you out there. Yes. But how do you get to the leap that it requires all the elements of a contract? I mean, we've never interpreted the word agreement to be synonymous with contract, have we? No, Your Honor. And so the UCC, the people's position is that it's applicable for three reasons. And the first is because the rational trier of fact at the court below specifically relied upon the uniform commercial code in reaching his understanding of whether an agreement occurred. Secondarily, simply by the plain language of this statute itself, in that it requires, again, a buyer and a seller who have reached an agreement to purchase a specific good, and then it criminalizes on the back end the purchase of that good, and it criminalizes the delivery of it within 72 hours. And so simply by the plain language of the statute, the legislature sought to make it more specific than a mere request. It now has certain elements. Right. But you're saying the plain language says contract? Simply by its terms, that it does involve two parties to a transaction where there's a buyer and a seller who reach an agreement to purchase. And again, one of the principles of statutory construction is, absent any other indication by the legislature, other well-established bodies of law that use similar language, that use similar terms, might be instructive. And contract law is instructive here. Both where it was relied upon by the trial court, it was relied upon by both parties in their briefs, that an agreement to purchase might have some grounding in contract law where essential terms have already been defined. By contract law, we know when parties reach an agreement. We know who the parties to the transaction are. We know when and where they're going to deliver and conduct their business. And certainly where the legislature sought to make 3AG applicable to private parties, equally to, you know, for example, stores like Blythe's Gun Shop. It was already applicable to them by virtue of the application. So the legislature amended the statute so that application for purchase could almost have a more colloquial meaning for private parties so that they could understand when they were running afoul of the terms of Section 3AG. And the UCC is simply by the fact that it's a well-established body of law, that it has been interpreted by courts before, and that it provides some guidance to ambiguous terms of a criminal statute that simply by their language invoke contract law. The UCC defines agreement and contract as two separate things, right? Yes, it does. And so the UCC defines an agreement separate than a contract, but the definition of the term agreement is only really applicable to commercial parties. And so when you follow the definition section of the UCC, it says agreement, and then it leads you to another section, and it says agreement suffices for a contract where there's an established course of dealing or where there's prior transactions. So you can agree loosely to terms, but if under Illinois law the minimum is nine transactions as far as the case law goes, that after nine transactions or so you have an established course of dealing such that a simple meeting of the minds would suffice to give you an oral contract or a written contract for that matter. Could I hear you say that under the UCC the word agreement is supposed to apply only between commercial parties? No, Your Honor, but it defines agreement separate than a contract, because the agreement, to be distinguished from an agreement to purchase as it is here in this scenario, the agreement is kind of a condition precedent to the formation of a contract. And the UCC says you can agree to terms and that agreement turns into a contract if you're a commercial party that has a prior course of dealing, or I suppose a private party that would have established kind of de facto that commercial course of dealing, that you would have had this transaction that you'd engaged in over nine or ten times with that other party. But that's not the case here. Here we have one prior transaction that was conducted differently. An agreement will turn into a contract if sufficient prior course of conduct fills in the missing gaps? Where the price term is omitted. And if it's commercial? I'm sorry, I don't quite understand. Did you say something about it's a commercial agreement? When you were making your distinction? Right, and so it does define agreement and a contract differently. And it says that, you know, a contract requires all these essential terms. And then it says if, for example, and the price term is the most notable, a price term is missing, then you can have an agreement that still suffices to make a contract because the price term will be supplanted by a course of conduct or a course of dealing or some other extrinsic evidence that you agreed to this contract despite not agreeing to the essential terms. And if you don't have that, then you have an agreement that has not reached the level of a contract? Yes, Your Honor. But the word in this statute is agreement. And so, Your Honor. So that sounds like you're helping the defendant's argument. Your Honor, so the word in this statute is agreement, but the context of the statute is that it's an agreement to purchase. And it's an agreement to purchase between two private parties, a buyer and a seller. And it criminalizes the transaction of that good. And it's, again, more properly understood as an oral contract between the parties. While it uses the term agreement, it's more properly understood as a phrase, agreement to purchase. And the agreement to purchase, which is also defined in the UCC, just flip the words, it's defined as a purchase agreement, is what the state is proffering is more akin to the situation here. And, again, where the people are not urging that the UCC is to be implanted upon this body of criminal law, it's just that where we're provided with a term like agreement to purchase, it has analogous terms in contract law, whether it's purchase agreement, whether it's oral contract. They all require certain essential terms to be agreed to. And the legislative intent in amending the statute was to make it more specific than this mere request. And it was to require two specific parties, a buyer and a seller, to reach that agreement and to reach an agreement on price, which did not occur in this case until April 19th. Counsel, you say, and correct me if I'm incorrect, as you were describing or explaining the UCC's use of the term or definition of the term, if the price term is not agreed upon or if it's not known, and if there has been a course of conduct nine, I think you used it, nine times, then the price term can be supplanted. Yes, Your Honor. Was there any proof or was there any evidence put forth below with respect to the number of times an exchange occurred or an agreement to purchase had occurred between Joe and DeLeon? Yes, Your Honor. And by the defendant's own statement, which is People's Exhibit Number 3, I believe it would fall on pages 1 through 3. He describes that he only engaged in two transactions. The first was for a .38 caliber pistol, and the transaction charge in this case was for a .40 caliber. And certainly the two prior courses of dealing, just that one prior transaction and this one, which was conducted wholly differently than the prior, is insufficient to rise to the level of such an understanding that they would know that $200 was going to be the purchase price for this gun. Do you think it's fair to say they were wholly different? In each case, they drove to the same gun store, bought the gun. Afterwards, after the defendant got legal possession of the gun, he gave it to Bill. In one, they drove together, and in the other, they drove separately. Other than that, what's different about these transactions? And so, Your Honor, if we're – They did the exact same thing a second time, didn't they? And so if we're looking at it in terms of what the essential terms of the agreement were, the essential terms of the agreement were different. They did have a different manner of delivery. They had a different good that they were purchasing. In the first transaction, they drove separately to the store, drove separately afterwards. They pulled over on the side of the road in Indiana and then effectuated a transfer, and then he paid him when they further got into Illinois. Here, they went together, they left together, they came back to Illinois with a .40-caliber handgun, not a .38. They effectuated a different manner of delivery and then paid a price for it. And so – What was the different manner of delivery? In that they – so in the first instance, they drove separately, pulled over on the side of the road, put the gun in the car. They made two purchases out of one on the second trip. What's the difference? Both in jurisdiction and in that when they ended up in Indiana, they essentially traded gun for money. They, in the first instance, transferred the firearm and then waited until they got back into Illinois to pay for it. On the second instance, they purchased the gun from Blythe's Gun Shop, drove from Indiana into Illinois, at which point they transferred and almost simultaneously paid the money for it. And while it's not – not certainly huge differences between the two transactions, whether or not they're the same, they don't rise to the level of the nine transactions that this Court would need to hold that there was an established course of conduct between – How significant about nine? Is it nine absolute? No, Your Honor. It's simply the – almost the low threshold of what this Court has considered a course of conduct. And so the people were unable to find anything lower. And it seems that a course of conduct really needs to be an established, whether business or personal relationship between two parties, such that it's almost unambiguous what the price is going to be, that every day I sell you something for $5 and that every day after that you know that it's going to be $5 because it's always been that way. But here we only have one prior transaction. We have a prior transaction for a different gun that while not significantly different, it was different. And so to implant the terms of a prior transaction onto a transaction in a different date is simply not what contract law had in mind, not what the statute itself contemplates by its plain language of the agreement between a buyer and a seller. So if we agree that the evidence shows that De Leon and Hill had an agreement on April 15th whereby De Leon would obtain a gun and sell it to Hill for money, but we agree that all of that was in the record, but there's nothing in the record that they specifically agreed on $200, you would say they have not met the definition of agreement to purchase? Yes, Your Honor, where the $200 is an essential term of that agreement. And so for these reasons and those expressed in our brief, the people respectfully request this Court affirm defendant's conviction for unlawful sale of a firearm. Thank you. Thank you. I have a couple of minutes for rebuttal. Thank you. Very briefly, Your Honors, as opposing counsel noted, the exact language from the record from De Leon's statement was that Joe gave De Leon approximately $200 for buying the gun for him at State Exhibit 3, page 5. De Leon is acting simply as a service provider. He's selling straw purchasing services. It is, as Your Honor put it, like a commission. And yet the straw purchaser statute, Section 24-3.5, wasn't charged here. That's different from the FOID count that opposing counsel mentioned, which De Leon was acquitted for for other reasons. The State's burden here was to show that the agreement arose 72 hours before delivery on April 19th, and they failed to do that. An agreement can arise before money changes hands. Those things don't necessarily have to be simultaneous. And the parties can agree, and the circumstantial evidence shows that they did so through prior dealings and through their actions on the date they traveled first to the light sports shop on April 15th, picked out a gun, and Joe provided the money to buy it. The prosecution isn't saying that the money had to change hands. They're saying April 19th is the operative date, because that's the first indication we have of an agreement on the price. The circumstantial evidence indicates an agreement before that. It indicates when Joe is traveling with De Leon to Blythe's, picking out the gun, giving him the front money to pay for that gun, and in an amount that's more than he would eventually pay for the services that De Leon is providing, there's already an agreement in place. That's when the application occurs, when they travel to Blythe's. How are we supposed to define this? We're being asked to interpret this. When we write our opinion, what do we say is what needs to be shown to show an agreement to purchase? An agreement to purchase is a meeting of the minds between the parties. It includes the subject matter of that agreement, which would include the gun here, and it would include a price term, but that was agreed here. That's understood between the parties when they travel to Blythe's on the 15th. The circumstantial evidence demonstrates that. There's simply no reason to go there unless you already know what's going to happen later on. You've already transacted for a different gun on a prior occasion in the exact same amount. It's clear that the parties knew $200 is going to be what you're paid for your services as a straw purchaser. If there are no other questions from the Court, I'd submit the case for decision. Thank you very much. This case was well-argued and very entertaining and well-briefed. We'll take it unadvised and issue a decision in due course. Thank you.